**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arthur C. KELLOGG, Defendant–
Appellant.**

No. 90–50522.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 6, 1992 *.

Decided Feb. 3, 1992.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Barry O. Bernstein, Law Offices of A. Brent Carruth, Woodland Hills, Cal., for defendant-appellant.

Elana Shavit Artson, Asst. U.S. Atty., Santa Ana, Cal., for plaintiff-appellee.

Before FARRIS, NOONAN and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Arthur C. Kellogg appeals his conviction and sentence for mail fraud, in violation of 18 U.S.C. § 1341 (1988), and aiding the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2) (1988). He claims: (1) there was insufficient evidence to support his conviction; (2) the court improperly conducted ex parte communications with the prosecutor; and (3) his right of allocution was violated. With respect to his first claim, Kellogg specifically argues he cannot be convicted of mail fraud for sending false tax returns because the Internal Revenue Service ("IRS") "itself requires the mailing of returns." We have jurisdiction under 28 U.S.C. § 1291 (1988), and we affirm.

I

Prior to and during 1985, Kellogg ran a tax-preparation business in California, the name of which he changed regularly. As part of that business, Kellogg interviewed

clients, took notes at the interviews, and had his staff generate tax returns based on those notes. Kellogg customarily reviewed the returns before they were sent to the clients or to the IRS. The government suspected Kellogg of systematically overstating his clients' tax deductions, credits, and exemptions.

On June 7, 1985, IRS Special Agent F. Neil Harris, posing as Nowell Harman, a fictitious employee of Hughes Aircraft Company, met with Kellogg to discuss the preparation of "Harman's" tax return. At the meeting, which Special Agent Harris secretly tape-recorded, Kellogg fabricated several possible tax deductions. When Harris stated he had borrowed $8000 to buy a car, Kellogg responded: "All right. So we take—so we have $8,000.00 and we take that at 20 percent and there's a $1,600.00 deduction just for interest on the car." Harris replied: "I don't think the credit union charges that much." Undaunted, Kellogg stated: "It won't be that much, but we will.... Now if it gets audited, why then they [sic] see you got a 96 percent chance they don't even pick it up."

At another point, Kellogg asked Harris to "Give me the name of a church you walk in and out of once in a while. Any one." When Harris complied and stated indeed all he did was walk in and out of the church, Kellogg stated:

> But the IRS doesn't know that. Any dedicated Catholic goes 52 times a year and he goes 52 times, he puts in $10.00 at a crack and that's $520.00. He's got to have, take seven holy days. Seven holy days, he puts in ten bucks in there and that's another 70 bucks. Now he's got a contribution of 590. The same guy gives if the [Salvation Army] came around and they picked up a bunch of stuff.... Funny thing. You are a generous guy, so you gave 'em $610.00 worth of shit. Good stuff because your wife died a few years ago, left you all this stuff, and you kinda—you were thinking about selling that—

When Harris stated, "That's a long time ago. She didn't die. She divorced me," Kellogg replied: "Right, but they don't know that.... I'm telling you what we tell 'em." The transcript of the interview, which goes on for over 100 typewritten pages,[1] is replete with similar examples of Kellogg's tax-evasion schemes. Kellogg himself testified the interview with Special Agent Harris was typical, and stated, "I always covered just exactly what that undercover agent found out on that tape[.]"

At trial, six other witnesses testified Kellogg had prepared their tax returns using a similar approach, and had claimed for them excessive or wholly fictitious deductions for charitable contributions, dependents, interest payments, business expenses, tax return preparation fees, and the like. Kellogg mailed or caused to be mailed several of the tax forms to his clients or to the IRS.

One of Kellogg's employees, Mary Dumas Pope, also testified. She stated Kellogg had instructed her to sign false or fictitious names to the tax preparer's signature block of his clients' tax returns. Kellogg annually changed the name of his tax preparation business, and Dumas testified Kellogg had instructed her to sign false names on business forms filed with the Social Security Administration.

Kellogg testified in his own defense. He stated he understood the tax laws and intentionally violated them by preparing fraudulent tax returns for his clients. At sentencing, he explained he had violated the law "to show America and to show everybody that was a client of mine what's wrong with this tax system...." Kellogg customarily claimed a fee equal to 20% of his clients' refunds.

## II

Kellogg claims he cannot be convicted of mail fraud because (A) he lacked the specific intent to defraud the government because he was acting as a tax protester, and (B) he was required by the IRS to use the mails to file the tax returns at issue in this

---

1. According to Special Agent Harris, the interview lasted "[a] little over two hours."

case. He also claims (C) he did not act "willfully," and (D) did not file any false tax returns, both of which are required for a violation of § 7206(2). We affirm Kellogg's conviction.

## A

■ We uphold the jury's verdict if " 'the evidence and all reasonable inferences which may be drawn from it, when viewed in the light most favorable to the government, sustain the verdict.' " *United States v. Davis*, 932 F.2d 752, 761 (9th Cir.1991) (citation omitted). "The elements of the offense of mail fraud under 18 U.S.C. ... § 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see United States v. Bernhardt*, 840 F.2d 1441, 1446 (9th Cir.1988), *cert. denied*, 488 U.S. 954, 109 S.Ct. 389, 102 L.Ed.2d 379 (1988). "A specific intent to deceive is an element of ... mail fraud...." *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991).[2]

Kellogg claims there was insufficient evidence for the jury to find he had the specific intent to deceive the IRS. This argument lacks merit. The tape of Special Agent Harris' meeting with Kellogg, Harris' testimony, and the testimony of Kellogg's other clients and employees support the reasonable inference that Kellogg specifically intended to defraud and deceive the IRS as to the deductions his clients deserved.

The fact that Kellogg may abhor our tax system is irrelevant. The evidence adduced at trial, including Kellogg's own admissions on cross-examination, his recorded interview with Special Agent Harris, and the fact that he had employees sign the fraudulent tax returns with fictitious names, all lead to the reasonable conclusion that he understood the tax laws, and knew he wrongfully was violating them. Given that knowledge and understanding, the alleged "motive for his actions, i.e., that of a tax protester," is irrelevant.[3] *See Cheek v. United States*, — U.S. —, 111 S.Ct. 604, 609–11, 112 L.Ed.2d 617 (1991); *cf. United States v. McCollum*, 802 F.2d 344, 346–47 (9th Cir.1986) (reviewing jury instructions on mens rea required by § 1341).[4]

## B

■ Kellogg also claims his conviction for mail fraud must be reversed because he was required by the IRS to use the mails to submit the fraudulent tax forms. We have found no Ninth Circuit case directly on point. Nonetheless, we reject Kellogg's argument. In the recent case of *United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991), the Second Circuit confronted an argument like Kellogg's. In *Helmsley*, the defendant claimed "that the mail fraud statute cannot apply in circumstances in which she was required to mail her ... tax returns." *Id.* at 94. The Second Circuit rejected this claim.

---

**2.** 18 U.S.C. § 1341 provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon ... any such matter or thing, shall be fined ... or imprisoned

. . . .

**3.** Indeed, it is worth noting that at sentencing Kellogg stated: "I'm not a tax protestor [sic]. I am going to redesign your [tax] system so that

it's far superior to anybody else's." Kellogg's apparent motive was to demonstrate to the IRS and to the American people the inefficiencies of the tax laws by violating those laws.

**4.** For this reason, the trial court did not abuse its discretion, *see United States v. Hernandez*, 876 F.2d 774, 778 (9th Cir.1989) (review for abuse of discretion district court's exclusion of evidence), *cert. denied*, 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989), in excluding from evidence certain letters which would have tended to establish Kellogg's status as a tax protester. *Cf. United States v. Dorrell*, 758 F.2d 427, 434 (9th Cir.1985) (upholding exclusion of evidence of political and religious motives for crime of destruction of government property).

Assuming, without deciding, that [the defendant] was prohibited from using any other delivery method [besides the mails], we reject her argument as a misreading of *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). That case held that school district employees who looted the district of funds obtained through mailed tax assessments and remitted checks did not use the mails for the purpose of executing a fraud within the meaning of Section 1341. *Id.* 363 U.S. at 393, 80 S.Ct. at 1184. The Court carefully limited its holding to the "particular circumstances of [the] case," relying on the facts that the school district was required to collect taxes, that the taxes assessed were not "padded," and that the assessment letters "contained no false pretense or misrepresentation." *Id.* 363 U.S. at 391–92, 80 S.Ct. at 1184. The scheme was essentially one to steal funds that had been mailed, not to cause deception through the mails. *See id.* at 379–82, 80 S.Ct. at 1177–79. In contrast, Mrs. Helmsley's mailings contained, or so the jury found, fraudulent misrepresentations. Thus, they were " 'part[s] of the execution of the fraud.' " *Parr*, 363 U.S. at 391, 80 S.Ct. at 1183 (quoting *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)).

*Id.* 323 U.S. at 95, 65 S.Ct. at 151 (alterations in *Helmsley*). We agree with this reasoning, and reject Kellogg's argument as the Second Circuit rejected Helmsley's argument.

### C

■ We also reject Kellogg's claim that he did not act "willfully" within the meaning of § 7206(2).[5]

Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.... [I]f the Government proves actual knowledge of the pertinent legal duty, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement. But carrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws.... In the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue....

*Cheek*, 111 S.Ct. at 610–11; *see United States v. Powell*, 936 F.2d 1056, 1061 (9th Cir.1991) ("the government may prove willful conduct by establishing either: (1) that the defendant acted with a bad purpose or evil motive, *or* (2) that the defendant voluntarily, intentionally violated a known legal duty"). There is no question that the government satisfied the "knowledge component" of willfulness: Kellogg knew of his duty not to defraud the IRS. Also, the evidence was sufficient for a rational jury to conclude Kellogg lacked a "good-faith belief that he was not violating any of the provisions of the tax laws." We will not disturb the jury's determination that Kellogg acted "willfully" within the meaning of § 7206(2). *See generally Davis*, 932 F.2d at 761.

### D

■ Kellogg contends his conviction under § 7206(2) cannot stand because he "has never been showed to have filed anything." The crime described by § 7206(2) is not

---

5. 26 U.S.C. § 7206 provides in pertinent part:
Any person who—
....
(2) Aid or assistance
Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document....
....
shall be guilty of a felony....

complete until a tax return actually is filed. *United States v. Dahlstrom*, 713 F.2d 1423, 1429 (9th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). However, the tax returns at issue in this case *were* filed with the IRS.[6] It is irrelevant that Kellogg himself did not file the returns, as long as he helped to prepare them and they were filed. *See United States v. Crum*, 529 F.2d 1380, 1382–83 n. 4 (9th Cir.1976). The evidence introduced at trial reasonably leads to the conclusion that Kellogg helped to prepare false tax returns and that the returns were filed. *See generally Davis*, 932 F.2d at 761.

### III

█ Kellogg claims: "During a recess, in the absence of defense counsel, the Court took the prosecutor and a note from the jury into another courtroom and conducted colloquey [sic]." Kellogg either misunderstands or intentionally mischaracterizes the facts.[7] As the government notes:

> Prior to commencement of the defense case, the court conducted a hearing outside the presence of the jury to address various legal matters. Before the jury was seated, the court advised all parties that a jury deliberating in another case was expected to return its verdict shortly. When the trial resumed, defendant testified and the defense began playing the tape recording of the June 7, 1985 meeting between defendant and Special Agent Harris. It soon became apparent that the tape contained an extensive gap. After listening to several minutes of silence, the court called a recess to permit defense counsel to correct the problem. During this recess, the court received a note indicating that the other jury had reached a verdict.

> The trial judge resumed the bench outside the presence of the jury to inquire whether either party objected to his absence while the tape was played. However, defense counsel was still occupied with the tape at the time the trial judge re-entered the courtroom. During defense counsel's momentary absence, the prosecutor stated that she had no objection to the court's proposed procedure. When defense counsel returned, the court repeated its question and ascertained that defense counsel had no objection to the court's absence. After hearing from defense counsel, the court brought in the jury and explained the reason for his absence. The court further instructed the jury that the court's absence did not differentiate the tape from any other evidence, and that they must pay as much attention and give the evidence the same weight as they would had the court been present.

> Defense counsel registered no objection to the court's absence during the playing of the tape. Nor did defendant object in the trial court to the alleged ex parte conversation.... [T]he jury was instructed to disregard the court's presence or absence in evaluating the weight to be accorded to the tape.

Brief for Appellee at 20–22 (citations to record omitted).

The trial transcript indicates the alleged ex parte communication to which Kellogg now objects is as follows:

> (Recess taken.)
>
> THE COURT: I have a note from the jury.
>
> Actually, you may both want to consider it. I'll tell you my proposal. Let me go take it in another courtroom. You're not going to object to anything on the tape. You objected to the introduction of the tape.

---

6. Kellogg argues: "Indeed, at least one of the returns prepared was for an imposter/agent of the IRS," Special Agent Harris, and never was filed with the IRS. Kellogg was not charged under § 7206(2) with respect to Special Agent Harris' tax return.

7. Kellogg's excerpt of record contains page 211 of the clerk's record, on which the court states:

"I have a note from the jury." Kellogg's excerpt of record does not contain pages 209 and 210 of the record, which make clear that the "note from the jury" discussed on page 211 is actually a note from a jury in another case. *See* pages 1249–50, *infra*.

MS. ARTSON [PROSECUTOR]: I have no objection to anything on the tape, Your Honor.

THE COURT: So is there any reason why I should sit here while it goes on rather than take a verdict?

(No responses.)

(Mr. Steward [defense attorney] not present.)

THE COURT: The answer to that is no?

MS. ARTSON: There is no answer. I'll let Mr. Steward answer for himself.

THE COURT: Well, he owes me; you don't owe me. He gave us 20 minutes of silence. He's the only one that has a right to complain here.

MS. ARTSON: I certainly have no complaint. If I were in Mr. Steward's position, I might have some concern.

THE COURT: We will see.

MS. ARTSON: Perhaps while you're waiting, Your Honor, could I just inquire, what was Your Honor planning to do in terms of the schedule for this afternoon; did you want to have the charging conferences before or after the summations?

THE COURT: Actually, I had intended to do it early, and things got mixed up, so we will have to do it obviously before you argue, and I don't know how much difference you have. I wouldn't expect too much.

(Mr. Steward now present.)

Mr. Steward, I didn't come out, as I sometimes do, just for the purpose of being obnoxious. I have a note from the jury, and I·have a proposal which, if it's acceptable to the parties, I will do, which is simply to let the tape go and go take the verdict. Obviously that needs a stipulation.

I would tell the jury why I was doing it, and the justification for it, because I've already ruled on any objections, that function is not to be had, and that they shouldn't therefore pay any less attention to it; it's like any other time when my attention is misdirected, they still have to direct their own.

If that's acceptable to the parties, we can save some time and not have everybody sitting around.

MR. STEWARD: Surely, Your Honor; that's fine with us.

In his brief, Kellogg argues: "Such ex parte communications should not be countenanced on any pretext...." Yet Kellogg's trial attorney knew of the conversation between the court and the prosecutor, and did not object to it. Accordingly, we review for plain error. *See United States v. Gomez–Gallardo*, 915 F.2d 553, 555 (9th Cir.1990). "Under this standard, we notice errors only if they affect substantial rights." *Id.* In any case, there was no improper ex parte communication between the judge and the prosecutor; certainly Kellogg's substantial rights were not affected.

## IV

■ Finally, Kellogg claims the trial court violated Fed.R.Crim.P. 32 when it interrupted his allocution.[8] Although the defendant has a right of allocution at sentencing, that right is not unlimited. Kellogg did address the court at sentencing. He spoke of the "giant loopholes" which exist in the tax laws, and scorned the IRS as incompetent. He discussed his work experience with Standard Oil, his ability to avoid the tax laws, his letters to high government officials, the problem of the national debt, and the fall of Eastern Europe. When the court proposed a recess, Kellogg stated, "Your Honor, I was going to say, when you're talking about balancing the budget and paying off the debt of the United States, that can't be done in 10 minutes. That takes years and years of training. Finally, you figure out—" In these circumstances, Kellogg's right to allocution was not violated. *Cf. Boardman v. Estelle*, 957 F.2d 1523 (9th Cir.1992); *Ashe v. North Carolina*, 586 F.2d 334,

---

**8.** Fed.R.Crim.P. 32(a)(1) reads in pertinent part:
Before imposing sentence, the court shall also—
....

(C) address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.

336–37 (4th Cir.1978), *cert. denied,* 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

AFFIRMED.