UNITED STATES of America, Plaintiff–Appellee,

v.

Michael LICCIARDI, Defendant–Appellant.

No. 92–10046.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 1, 1993.

Opinion Withdrawn July 22, 1994.

Decided July 22, 1994.

**1128**

Michael Babitzke, Stockton, CA, for defendant-appellant.

Steven Lapham, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

## ORDER

The opinion of this court filed January 11, 1994 is **withdrawn**.

Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.

## OPINION

NOONAN, Circuit Judge:

Michael Licciardi appeals his conviction under 18 U.S.C. § 371 of conspiracy to defraud the United States by obstructing the functions of the Bureau of Alcohol, Tobacco and Firearms (the BATF); of two convictions under 18 U.S.C. § 1341 of mail fraud; and of his conviction under 18 U.S.C. § 1001 of making a false statement. This case involves an effort of the government to extend substantially the scope of the general conspiracy statute. Despite disagreeing with one major theory of the government, we affirm Licciardi's conviction for conspiracy and his conviction on the other counts. We remand for resentencing.

### THE INDICTMENT

Licciardi was indicted for the following offenses:

Count 1. From January 1987 to April 1989 Licciardi was charged with a conspiracy whose "object" was to "defraud the United States and its agency, the BATF, by obstructing, impairing and defeating the lawful function of the BATF to assure the integrity and varietal designations of wine through examination and analysis of records maintained honestly and accurately and free from deceit, trickery, fraud and dishonesty, in violation of Title 18 U.S.C. § 371."

In Subsection b of the same count the "object of the conspiracy" was said to be the use of the mails to obtain money from Delicato Vineyards (Delicato) and other wine producers by fraud in violation of 18 U.S.C. §§ 1341 and 2 and to conduct financial transactions involving the concealment of the proceeds of unlawful activity in violation of 18 U.S.C. § 1956(a)(1).

In addition to this section of the indictment entitled "Object of the Conspiracy" was a section called "Purpose of the Conspiracy," which stated: "The purpose of the conspiracy was to obtain a higher price for defendant's grapes than those grapes would otherwise have commanded in the market place by misrepresenting the variety and appellation of origin of grapes being sold."

Counts 2 through 6 charged Licciardi and others with an attempt to defraud Delicato and others in the period January 1987 to April 1989 by false representations in connection with the purchase and sale of grapes; it asserted that in the execution of this scheme Licciardi knowingly caused mail to be mailed on five specific dates between September 22, 1988 and November 11, 1988.

Count 7 charged Licciardi with a financial transaction concealing a check for $10,000 representing proceeds from unlawful activity in violation of 18 U.S.C. § 1956(a). Count 8 charged him with a similar offense as to a check for $90,000. Count 9 charged him with a similar crime as to a check for $218,652.

Count 10 charged him with a false material statement within the jurisdiction of the BATF, made on August 14, 1989, in violation of 18 U.S.C. § 1001.

Counts 11 and 12 charged him with income tax evasion on his federal income tax returns from 1987 to 1988.

## TRIAL

At the trial Licciardi was found guilty of conspiracy under Count 1; of two counts of mail fraud, Counts 5 and 6; and of the false statement charged in Count 10. The jury could not agree on the Count 4 charge of mail fraud. He was acquitted on the second and third charges of mail fraud and of the charge of tax evasion in 1987. The jury could not agree as to the 1988 income tax evasion count. The district court denied his motion for a new trial.

Licciardi was sentenced to 51 months imprisonment.

## FACTS

As the government prevailed at trial we take the facts established by testimony from the government's point of view:

Licciardi was a partner with his father in a grape brokerage business, Corvette Company (Corvette). Corvette bought grapes from the growers and sold them, almost exclusively, to Delicato; almost 90 percent of Delicato's purchases from brokers were from Corvette. During the crush in the fall of the year, Licciardi had 24–hour access to Delicato, including the areas where the grapes were received, weighed and dumped into the crushers. During this period Licciardi occupied an office at Delicato's from which he scheduled and supervised deliveries of grapes from Corvette. His position gave him the opportunity for the deceitful transactions set out here.

During the mid–80s there was a rise in the price of Zinfandel grapes, and between 1985–1988 the price rose from $100 per ton to $900 per ton. At the same time the price of similar-looking grapes such as Mission, Grenache, Barbera, and Valdepenas remained constant at approximately $150–200 per ton.

In 1987, before the harvest, Licciardi agreed with Nick Bavaro, a wine grower, for Bavaro to deliver grapes to Delicato without field tags. A field tag is a document prepared in the field at the time the grapes are harvested. It contains the name and address of the grape grower, the grape variety, the date, the name of the trucking company providing the grapes and the license number of the trucks. The field tag is taken to the winery by the truck driver with the load of grapes. The winery then uses the information on the field tags to prepare the California Department of Food and Agriculture Weighmaster Certificate. The winery uses the field tag and the certificate to file reports required by the BATF.

· Bavaro and Licciardi arranged for grapes to be delivered at hours when the state inspector was not present. Deliveries were, for example, at two, three or four a.m. In 1987, according to Bavaro, he delivered between 1,400 and 1,500 tons of Carignane, Grenache and Valdepena grapes selling at

approximately $150–175 per ton. They were represented to Delicato as Zinfandel grapes selling at $500 a ton. The difference between the value of grapes actually sold and the price charged was $420,000. In 1988, according to Bavaro, he delivered about 225 tons of Grenache or Riesling grapes selling at $175–$200 per ton, represented as Zinfandel grapes worth $1,000 a ton.

In addition to his deal with Bavaro, Licciardi in 1987 entered into an agreement with Gary Alfieri by which Licciardi would arrange to mix Valdepena grapes with Zinfandel grapes coming from Alfieri's mother's property. In connection with this transaction Licciardi and Alfieri agreed to make use of a company named Viviano & Klein (V & K), a shell created and owned by Alfieri without offices, employees or assets. On Licciardi's instructions, Alfieri established a telephone number and post office box in San Francisco in the name of V & K. It was agreed that the grapes being delivered to Delicato would be delivered as coming from V & K. In 1988 Alfieri received a check for grapes delivered as Zinfandel that were in fact not Zinfandel. The check had been mailed to the post office box set up for V & K.

In 1988 Licciardi arranged for Alfieri to deliver Bavaro grapes to Delicato under the name of V & K. Also in 1988 Licciardi arranged for Alfieri to form a company called F. Riana Enterprises. A portion of the misrepresented grapes from Bavaro was delivered to Delicato under this name.

Also in 1988 Licciardi agreed with David Dedini to buy three loads of Dedini's Grenache grapes. These grapes were delivered to the Pedizitti Winery as Zinfandel; two of the three loads were rejected.

In 1987 Licciardi also arranged for the delivery to Delicato of Grenache grapes coming from property owned by the Licciardi family. The grapes were delivered as Zinfandel and were delivered at a time when the state inspectors were no longer at the winery. In 1988, too, grapes from this property were delivered to Delicato with the field tags changed to show Zinfandel.

In September 1988 Richard Gahagan, a representative of the BATF, and Eugene Arthur, a representative of the California Department of Food and Agriculture (CDFA), met with Licciardi to inquire about the deliveries made by V & K and Riana. They wanted to know who the principals were and where the grapes came from. Licciardi told them that he had had dealings with Mr. Klein and Mr. Riana.

Soon after this meeting Licciardi got together Bavaro, Alfieri, Dedini, and two others and told them the state was asking for maps and information regarding the location of V & K and Riana Vineyards. Licciardi told Alfieri to write a letter to Corvette stating that Bavaro had made the deliveries under these names, and he told Bavaro to write a letter to Delicato confirming this story. Alfieri and Bavaro complied. Licciardi provided their letters to Delicato, which, on November 23, 1988, provided them to the CDFA. On November 25, 1988 Licciardi mailed a letter to the CDFA stating that he had visited the vineyards of V & K.

On August 14, 1989, Licciardi was present at a meeting requested by his father with the federal agents. Licciardi told the agents that he had visited the Riana and V & K Vineyards and had talked to representatives of these wineries.

## ANALYSIS

### The Validity of Count 1 of the Indictment

■ Prior to trial, Licciardi challenged Count 1 as duplicitous, that is, as stating two distinct charges, a conspiracy to defraud the United States and a conspiracy to commit mail fraud. In making the challenge prior to trial Licciardi followed exactly Fed.R.Crim.P. 12(b)(2) and our holding in *United States v. Gordon*, 844 F.2d 1397, 1400 (9th Cir.1988). In moving for a new trial, Licciardi forcefully renewed the objection. He did not waive it in the trial court.

According to *Gordon*, an indictment that charges a conspiracy to defraud the United States and a second conspiracy to cover up the fraud is duplicitous and therefore invalid, because it is impossible to tell on which charge the jury convicted. *Id.* at 1401. A

conviction obtained under these circumstances cannot stand. Attempts by prosecutors "to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions" are viewed "with disfavor." *Grunewald v. United States,* 353 U.S. 391, 404, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957).

*Gordon* does not control the present case. *Gordon* charged two distinct conspiracies: (1) to defraud the United States and (2) to conceal and cover-up that conspiracy and obstruct an investigation by the grand jury into that wrongdoing. *Id.* at 1401. In contrast the indictment here did not charge a separate cover-up conspiracy but a mail fraud conspiracy. Under existing law, the government must charge a single conspiracy which contemplates the violation of two different statutes in the same count; otherwise the indictment would be multiplicitous. *Launius v. United States,* 575 F.2d 770, 771 (9th Cir.1978); *United States v. Noah,* 475 F.2d 688, 693 (9th Cir.), *cert. denied,* 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973). Such was, in fact, the conspiracy charged here. A portion of the government's mail fraud case did turn at trial on evidence showing a cover-up conspiracy. But a substantial part of the evidence showed mail fraud as part of the main conspiracy: the establishment and use of a post office box to receive proceeds of the conspiracy. There was sufficient evidence to support the jury verdict. *Griffin v. United States,* 502 U.S. 46, —— –——, 112 S.Ct. 466, 473–474, 116 L.Ed.2d 371 (1991).

*Mens Rea*

■ On appeal, Licciardi argues that there was no evidence that he had an intention to defraud the United States. It is true that the general conspiracy statute has been given a very broad meaning so that "defraud" extends beyond its common law usage and includes interference or obstruction of a lawful governmental function "by deceit, craft or treachery or at least by means that are dishonest." *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1923). If all the government had to prove was that Licciardi had used dishonest means and that these means had the effect of impairing a function of the BATF, the gov-

ernment would easily have prevailed. Under 27 U.S.C. § 205(e) it is unlawful for a winery to sell in interstate commerce wine unless it is packaged in conformity with regulations prescribed by the Treasury with respect to labeling which will provide the consumer "with adequate information as to the identity and quality of the product." The Treasury has prescribed such regulations in 27 C.F.R. §§ 4.20 & 20. The BATF has the function of enforcing these standards. 27 C.F.R. § 1. Licciardi's dishonest methods would have had the effect of preventing Delicato from complying with the regulations and would have therefore prevented the BATF from enforcing the regulations.

■ The difficulty for the government is Licciardi's *mens rea* for commission of the federal crime. *Mens rea* is, of course, a fundamental requirement of our criminal jurisprudence. *Morrisette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951). In the case of a charge of conspiracy to violate the federal statute the government "must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola,* 420 U.S. 671, 686, 95 S.Ct. 1255, 1265, 43 L.Ed.2d 541 (1975). This requirement has been the rule for at least a century. *Pettibone v. United States,* 148 U.S. 197, 207, 13 S.Ct. 542, 547, 37 L.Ed. 419 (1893) ("the specific intent to violate the statute must exist to justify a conviction").

Much of the reason for insisting on *mens rea* is to prevent "ostensibly innocuous conduct" from unwittingly becoming criminal. *See Staples v. United States,* —— U.S. ——, ——, 114 S.Ct. 1793, 1800, 128 L.Ed.2d 608 (1994). It will be observed that Licciardi was far from innocent morally or in terms of the law of California. But the question is whether he was innocent of any design to commit a federal crime. On this point evidence was required.

The rule requiring *mens rea* was repeated with approval in *Ingram v. United States,* 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). In that case the conspirators were engaged in gambling in violation of the laws in Georgia and "the participants in this large-scale enterprise had, through a variety of

carefully planned stratagems, made every effort to conceal its operations." *Id.* at 674, 79 S.Ct. at 1317. The conspirators used a variety of dishonest means including false names, false license plates, and attempted bribes. Beyond challenge, the means were dishonest and had the effect of interfering with the Internal Revenue Service's collection of the federal gambling tax. But the two conspirators who helped conceal the conspiracy were held not to be liable for violation of the federal conspiracy statute. They were held not to have had knowledge of the wagering tax liability of the principals and without that knowledge not to have had the *mens rea* required for conviction. *Id.* at 680, 79 S.Ct. at 1320.

More recently the United States indicted and convicted two businessmen of defrauding the United States in violation of 18 U.S.C. § 371 for their fraud on Seminole Electric Cooperative, Inc. in connection with a Seminole project guaranteed by the Rural Electrification Administration (REA). The theory of the government was that the fraud on Seminole impaired the lawful functions of the REA in running its guarantee loan program and that consequently the United States was defrauded. Undoubtedly, the REA's functions were impeded. Undoubtedly also, the conspiracy statute covers conspiracies to defraud the United States in "any manner for any purpose," putting no limits as to the methods used to defraud the United States. *Tanner v. United States,* 483 U.S. 107, 129, 107 S.Ct. 2739, 2752, 97 L.Ed.2d 90 (1987). But the Supreme Court held that a conspiracy criminalized by § 371 is "most importantly" defined by the "*target* of the conspiracy." *Id.* at 130, 107 S.Ct. at 2752, (emphasis in original). The government's theory, the Court unanimously held, had "not even an arguable basis in the plain language of § 371". *Id.* at 131, 107 S.Ct. at 2753. Consequently, the Court held that the government had failed to prove its case.

By the same standard, the Court in *Tanner* held that the conspiracy conviction could be upheld if, on remand, the court of appeals found that there was sufficient evidence to establish that the defendants had conspired to cause Seminole to make misrepresenta-

tions to the REA. *Id.* at 132, 107 S.Ct. at 2753–54. In that event the defendants would have had the requisite *mens rea* of defrauding the United States, using an intermediary to accomplish their fraud.

Under this consistent construction for a century of § 371, the government has failed to prove its case against Licciardi for conspiracy to defraud the United States by impairing the functions of the BATF. That the incidental effects of Licciardi's actions would have been to impair the functions of the BATF does not confer upon him the *mens rea* of accomplishing that object.

It might have been easy for the government to establish that Licciardi was familiar with the federal regulations on the labelling of wine and that it was a necessary part of his plan of deceit that Delicato provide information to the government that would frustrate these regulations. But we cannot speculate as to what the government might have proved when it did not make the effort to show that Licciardi had "conspired to cause" Delicato to provide false information to the BATF. Because this kind of proof was not offered, the basis suggested in *Tanner* for upholding the conviction of the Seminole defendants is lacking.

The government relies on *Feola,* but does so mistakenly. There the substantive criminal statute was violated when someone assaulted a federal officer, whether or not he knew his victim was a federal officer. By the same token, the conspiracy statute did not require knowledge that the victim was a federal officer, because no greater knowledge and intent were required for the conspiracy than for violation of the substantive statute. *United States v. Feola,* 420 U.S. at 692, 95 S.Ct. at 1267–68.

The government also relies on *United States v. Sorrow,* 732 F.2d 176 (11th Cir. 1984). It is doubtful that *Sorrow* survives *Tanner.* But if it does, it does not speak to the present case where no property was obtained from a body funded by the United States and the fraud charged was simply the impairment of functioning by a federal agency.

Long ago Learned Hand referred to the general conspiracy statute as the "darling of the modern prosecutor's nursery." *Harrison v. United States,* 7 F.2d 259, 263 (2d Cir. 1925). It is understandable why that should be so, and it is perhaps understandable but regrettable that prosecutors should recurrently push to expand the limits of the statute in order to have it encompass more and more activities which may be deeply offensive or immoral or contrary to state law but which Congress has not made federal crimes. It is instructive that *Pettibone* in 1893, *Hammerschmidt* in 1924 and *Tanner* in 1989 are all instances where the Supreme Court rebuffed a prosecutor's imaginative and unjustified expansion of the statute. We have only recently had to do the same. *United States v. Caldwell,* 989 F.2d 1056 (9th Cir.1993).

The Supreme Court has very recently had occasion to observe that where "a severe penalty" is attached to a crime, it is unlikely that *mens rea* need not be proved. *Staples v. United States,* — U.S. at ——, 114 S.Ct. at 1804. In the instant case we note that a regulatory scheme, which does not have criminal penalties attached to it, has been converted by the government's theory into a system whose violation by commercial cheating is subject to the severe felony penalties of the conspiracy law. We do not accept that theory.

The government has a second string to its bow or, to use Hand's metaphor, a second darling in the modern prosecutor's nursery. If there is sufficient evidence of a second object of the charged conspiracy, we cannot set aside the jury verdict. *Griffin v. United States,* — U.S. at ——-——, 112 S.Ct. at 473–74. The government says nothing on this appeal about the charged objective of Licciardi conducting financial transactions to conceal unlawful activities. The government does, however, refer to the charged objective of the conspiracy to obtain money from Delicato by fraudulent representations in violation of 18 U.S.C. §§ 1341 & 2. The government points to the mail fraud counts on which Licciardi was convicted.

In 1987, the first year of the conspiracy, Licciardi arranged with Alfieri for the establishment of a post office box in the name of a fictitious company, intending to use the mails to keep his fraud secret. In 1988, a check representing the proceeds of one of the fraudulent transactions was sent through the mails to this post office box and at Licciardi's direction recovered from this box. These facts established that Licciardi had the requisite *mens rea* to commit mail fraud. His conviction of conspiracy must be sustained.

■ *The Count 5 Mail Fraud.* Licciardi argues that there was not proof beyond a reasonable doubt that the letter from Delicato to Manning at the CDFA was mailed. There was, however, proof beyond a reasonable doubt that Licciardi reasonably foresaw that the material he supplied Delicato would be mailed, and his letter to Arthur shows that he knew it had been "sent" to the CDFA. The evidence was sufficient to convict him of mail fraud in supplying the false information that Delicato forwarded through the mails. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954).

■ *The Count 6 Mail Fraud.* The letter that was the subject of this count was admittedly mailed by Licciardi to Arthur. It contained false statements meant to cover the fraud and so was a part of the scheme to defraud. Licciardi argues that the letter was legally compelled because the CDFA licenses growers. But a conviction for mail fraud may be upheld where "legally compelled" mailings were part of the scheme. *United States v. Kellogg,* 955 F.2d 1244, 1247–48 (9th Cir.1992). Moreover, while it may be true that the CDFA could have compelled Licciardi to respond to its inquiries, it did not compel him to write this letter. His defense is unavailing.

■ *The False Statement.* Licciardi contends that "the exculpatory no" is a defense to his false statement made to the BATF inspector in 1989. *United States v. Medina De Perez,* 799 F.2d 540 (9th Cir.1986). Although the doctrine bears the generic title of "the exculpatory no" it has been extended to include affirmative statements which include detailed fabrications. *United States v. Myers,* 878 F.2d 1142, 1143 (9th Cir.1989). Licciardi fails the requirement of that test

that he be responding to inquiries initiated by the government. Licciardi was voluntarily attending a meeting arranged by his father and he volunteered the false statements he made to the BATF agent. *United States v. Alzate–Restreppo,* 890 F.2d 1061, 1065 (9th Cir.1989).

*The Sentence.* Under the Guidelines, the sentence imposed on Licciardi was as follows: base offense level for fraud under Section 2F1.1(a) = 6; loss under Section 2F1.1(b)(1)(N) = 10; more than minimal planning under Section 2F1.1(b)(2) = 2; leadership role under Section 3B1.1(a) = 4; obstruction of justice under Section 3C1.1 = 2. Total = 24. With a criminal history category of I, the applicable guideline range was 51–63 months. The district court sentenced him to 51 months. He challenges several of the increases of the base level.

■ Licciardi argues that he was not the organizer or leader because Bavaro admitted that he was practicing the same scheme not only on Delicato but on a number of other vineyards, including Mondavi, Sebastiani, Charles Krug, Anheuser Busch's Master Cellars, and Pedrizetti. The evidence that Licciardi was a leader of the widespread scheme to defraud numerous wineries is not very clear. However, there does appear to be sufficient evidence for the district court to conclude that Licciardi was the organizer of the persons defrauding Delicato.

■ Licciardi also contends that the enhancement for more than minimal planning should not be imposed simultaneously with the enhancement for leadership. However, we have already concluded that the enhancement for more than minimal planning punishes the devisor of a complex criminal scheme; the leadership enhancement punishes the defendant's role. And they both may be applied. *United States v. Kelly,* 993 F.2d 702, 705 (9th Cir.1993).

■ Licciardi's most extensive challenge is to the computation of the loss that his scheme caused. The scheme to defraud Delicato by mail was charged in the indictment, and we have concluded that it was proved. It is not necessary for the government to prove that a particular mailing resulted in the loss. *Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1399–1400 (9th Cir.1989). All the losses resulting from the scheme to defraud must be taken into account. U.S.S.G. § 2F1.1, Application Note 6.

At the sentencing hearing Licciardi presented a deposition in a civil matter in which Bavaro indicated that corporate officers of Delicato were aware of the fraud. The district court accepted for sentencing purposes the assertion that "there were insiders at the highest level who were in on the scam ... the court will find on your behalf on that matter.... I will accept that there is significant evidence along that line." Licciardi argues that he was not charged with defrauding the consumers and could not have defrauded Delicato if its corporate officers were willing. We have previously rejected this argument. *Kempe v. Monitor Intermediaries, Inc.,* 785 F.2d 1443, 1444 (9th Cir.1986).

■ At sentencing, the government offered Gahagan's testimony that a total of 4,900 tons of grapes were misrepresented by Licciardi to Delicato as Zinfandel and that 4,900 multiplied by the price paid by Delicato caused the total fraud to be $3,130,939. The district court, however, declined to order Licciardi to make restitution because "I can't for the life of me figure out who Mr. Licciardi owes, if anybody, and what he owes, if anything. That is not to say that he doesn't. The court is not making a finding either way." If the court was unable to determine what Licciardi owed, we have difficulty in seeing how it could determine the loss. On this point there must be a remand for a finding as to what losses were caused by Licciardi working with Bavaro and Alfieri.

Licciardi argues that he should be given credit for the value of the grapes that were delivered because the loss inflicted on Delicato was less than the total price paid by Delicato for the grapes that were delivered. The district court accepted this contention, saying that it would deduct $175–$200 per ton of misrepresented grapes. We cannot see that this deduction was made. On this point, too, a remand is necessary.

Accordingly, the judgments of convictions are **AFFIRMED.** The case is **REMANDED**

for resentencing in accordance with this opinion.

FLETCHER, Circuit Judge, concurring specially

I concur in Judge Noonan's opinion except as I express my disagreements below.

I

I agree with the majority that the conspiracy indictment is not duplicitous, but I believe it is worth spelling out in greater detail why this is so. Under *United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir.1988), an indictment which charges a coverup conspiracy distinct from the primary conspiracy is duplicitous because it poses the risk of a nonunanimous jury verdict. This case initially appeared to be similar to *Gordon*, because the mail fraud conspiracy charged in the indictment appeared to have been carried out pursuant to a separate agreement, and at a different time than the primary conspiracy to defraud. In other words, the mail fraud conspiracy charged in Count 1 appeared to track precisely that kind of coverup conspiracy which *Gordon* held must be charged separately.

The government has convincingly argued, however, that the primary activity of defrauding the winery and the subsidiary conspiracy of concealing the fraud overlapped. Alfieri testified that the purpose behind writing the letters which eventually became the basis of the Count 5 mail fraud "was to justify the delivery to cover everything up so payment could be made." Tr. at 265. Through the same actions, the conspirators attempted to ensure that they would continue to perpetrate their fraud on the winery and thereby make money, and that they would conceal their fraud. As a factual matter, there was a single conspiracy. It is for this reason that the indictment was not duplicitous.

II

I disagree with the majority's conclusion that "the absence of mens rea" requires reversal of the conspiracy conviction under the first of the government's two conspiracy theories.

To understand my point, it is important to keep in mind that 18 U.S.C. § 371 consists of both an "offense" clause and a "defraud" clause: it criminalizes both conspiracies "to commit any offense against the United States" and conspiracies "to defraud the United States or any agency thereof." The offense clause is premised on a conspiracy to commit a predicate act that violates a statute other than the conspiracy statute; the defraud clause involves a violation of the conspiracy statute itself. Count 1 included a charge under both clauses. Judge Noonan would affirm the conspiracy conviction under the offense clause, on the basis that Licciardi conspired to commit mail fraud; a conviction under the defraud clause, according to the majority, cannot stand. My focus is on the charge under the defraud clause.

*United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), clarified the body of conspiracy law relating to conduct falling under the offense clause: *Feola* held that the level of intent required to meet the jurisdictional element of a conspiracy charged under the offense clause was the same as the level of intent required to meet the jurisdictional element of the underlying offense. In *Feola*, intent to assault was all that was required; knowledge that the victim was a federal officer was *not* required. The majority is certainly correct that the outcome in *Feola* provides only limited assistance to the government in this case, since the underlying offense in *Feola* clearly did *not* require anti-federal intent, while the same cannot be said here. But by the same token, cases like *Ingram v. United States*, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959), in which the underlying statute *did* require knowledge that the United States was being deprived of money which was its due, offer no support for the assertion that knowledge of federal involvement is required in this case. In contrast to both *Feola* and *Ingram*, the charge in this case falls under the defraud clause, and hence involves no underlying offense at all. Without an underlying offense and without *Feola*'s formulation to guide us, the matter of determining what level of intent is required is more difficult than it is in the case of an offense clause conspiracy. The

issue should not be confused, however, by reference to cases like *Ingram*.

The Supreme Court case which addresses conspiracy charges brought under the defraud clause is *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). I disagree with the majority's reading of that case. The majority emphasizes *Tanner*'s statement that a conspiracy criminalized by § 371 is "most importantly" defined by the "target of the conspiracy." 483 U.S. at 130. The majority derives from the latter phrase the conclusion that a person whose conspiratorial acts have the effect of defrauding the federal government escapes § 371 liability unless he knew that his acts would have the effect of defrauding the government. In fact, however, the Supreme Court's disposition in *Tanner* indicates just the opposite.

In *Tanner*, the prosecution tried to link the defendants' deceptive acts to an effect on the federal government in two distinct ways. The Court rejected the first way, but accepted the second. The government's first argument, which the Court disposed of in that part of the opinion on which the majority relies, was that a fraud on a private corporation which receives government funding *is* a fraud on the government. In dismissing that argument, the Court pointed out that such a "sweeping interpretation of § 371 ... would [i]n effect substitut[e] 'anyone receiving federal assistance and supervision' for the phrase 'the United States or any agency thereof.'" 483 U.S. at 132, 107 S.Ct. at 2754.

The prosecution's second argument was encapsulated in the language of the indictment, which the *Tanner* Court quoted:

"It was further a part of the conspiracy that the defendants would and did cause [a third person] to falsely state and represent to the [government] that a [government]-approved competitive bidding procedure had been followed ..."

483 U.S. at 132, 107 S.Ct. at 2754. The Court *accepted* this method of connecting the conspiracy to the defrauding of the government, and remanded the case to the Eleventh Circuit for a determination of whether "the evidence presented at trial was sufficient to establish that petitioners conspired to cause [the third person] to make misrepresentations to [the government]." *Id.*

The evidence in this case was sufficient to establish just such a conspiracy. There is no question but that Licciardi conspired with Bavaro, Alfieri and others to provide false field tags, and that Delicato passed these on to the BATF in compliance with its reporting obligations. This linkage between the conspiracy and the government—in which the defendant directly manipulated a third person and caused that person to *make a false statement to the government*—appears to be precisely what the *Tanner* Court held *would* be sufficient to uphold a § 371 conviction. And it is entirely distinct from the linkage which was rejected by *Tanner*—where the fraud perpetrated on a private person may have some impact on the government simply because the government has a fiscal relationship with the private person.

This case can also be conceptualized as one in which *defendant himself* made false statements to the government, passing them along through the conduit provided by the third person. In this light, the government's election to charge under the defraud clause is ironic. The government easily instead could have charged Licciardi with conspiring to commit an offense against the United States—making false statements in violation of 18 U.S.C. § 1001. Under *United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), the lack of anti-federal intent does not bar a conviction for the substantive offense.[1] And under *Feola*, the same would pertain to the offense of conspiracy. In other words, Licciardi's conviction could easily be sustained under the offense clause of § 371 had the government simply drafted the indictment differently.

Irony aside, of course, we must evaluate the charges against Licciardi as they were framed by the government. The government has made precisely the linkage between the conspiracy and its federal "target" that was endorsed as adequate in *Tanner*: it has

---

1. Indeed, Licciardi's situation seems very much parallel to Yermian's: both defendants supplied false documents to a third party, which passed those documents along to the government pursuant to regulations which applied to that third party, even though they did not directly apply to the defendant.

shown that Licciardi "conspired to cause [a third person] to make misrepresentations to [the government]." The prosecution need not show that Licciardi *knew* that the federal government was the ultimate recipient of the misrepresentations.[2] Because this case seems to fall precisely within that portion of *Tanner* in which the Supreme Court held that the government had correctly charged a conspiracy under the defraud clause of § 371, I do not agree that a conviction under the defraud clause must be reversed on the grounds that the government failed to show anti-federal intent.[3]

Because the conviction can be affirmed on the basis of a conspiracy under the defraud clause, I would not reach the question of whether a conviction based on conspiracy to violate the mail fraud statute could be affirmed in this case. I am not suggesting that it cannot be affirmed on that basis, but I am uncomfortable relying on a theory eschewed by the government.

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I join all of Judge Noonan's well-reasoned opinion except that part which affirms the conspiracy conviction. I agree with Judge Noonan that this case is an example of the government's attempt to expand the conspiracy statute significantly. As he persuasively explains, it is our obligation to hold the government strictly to its burden of proof in conspiracy cases, for history shows that prosecutors have too often sought to extend the conspiracy statute far beyond its limits.

I cannot agree, however, that the government has demonstrated sufficient evidence of a second object of the charged conspiracy. As the majority rightly notes, "[t]he govern-

ment says nothing on this appeal about the charged objective of Licciardi conducting financial transactions to conceal unlawful activities." Majority opinion at 1133. Rather, the government relies *solely* on the charged objective of mail fraud. To support this objective, it points *only* to Licciardi's convictions on Counts 5 and 6. Yet these convictions are insufficient to show, as the government must, that the use of the mails was actually contemplated at the time Licciardi entered into the conspiracy to sell mislabeled grapes. *See United States v. Donahue,* 539 F.2d 1131, 1135 (8th Cir.1976); *see also United States v. Reed,* 721 F.2d 1059, 1061 (6th Cir.1983) (holding that the government must show "an agreement to defraud plus knowledge that the use of the mails was reasonably foreseeable"). Both convictions involved mailings that occurred nearly two years *after* Licciardi entered into the conspiracy; they do not demonstrate that he foresaw using the mails when the conspiracy began.

I note that the majority points to facts which might indicate that Licciardi foresaw using the mails at the time he entered into the conspiracy. However, the government has chosen not to rely on those facts. On appeal, it has relied *exclusively* on the facts underlying Licciardi's two mail fraud convictions. Because the government has not seen fit to assert any other facts as alternate grounds for upholding the conviction, I do not think that it is appropriate for us to do so. In my opinion, an appellate court should not substitute its theory of the evidence for the prosecution's in an effort to uphold a conviction on a basis that the government elects not to argue. We should assume that the prosecution knows more about its case than we do, and that if it chooses not to rely on particular evidence or theories that might

---

**2.** This case is entirely distinguishable from *Staples v. United States,* —— U.S. ——, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), relied on by the majority. The *Staples* Court was concerned with the use of mens rea to ensure that those who engage in "ostensibly innocuous conduct" do not wind up facing criminal liability. *Id.* —— U.S. at ——, 114 S.Ct. at 1800. As even the majority acknowledges, Licciardi's conduct was anything but "ostensibly innocuous." Licciardi knew he was defrauding the winery and he knew he was defrauding the state regulators. It was his purpose to do so. *Staples* is inapposite.

**3.** It should also be pointed out that *Tanner*'s "target" language, on which the majority primarily relies, appears to apply to *all* "conspiracies criminalized by § 371"—not just to those falling under the defraud clause. 483 U.S. at 130. If the language pertains to conspiracies under the offense clause as well as to those under the defraud clause, then the "target" requirement clearly cannot be the same as a requirement for anti-federal intent, since ever since *Feola* it has been clear that a defendant can be convicted under the offense clause even if he knew nothing about the federal consequences of his wrongdoing.

seem appealing to us, it has a valid reason for that decision.* While usurping the role of the prosecutor may not result in a serious injustice in this case, such judicial eagerness to uphold convictions—whether in business fraud, environmental, or more routine criminal cases—can readily lead to the undermining of our essential liberties. The practice is one that is injudicious and undesirable at best. It is also one that I trust my colleagues will join me in discouraging in future cases.

Because Licciardi's conviction on Count One cannot be sustained on the basis of either of the arguments asserted by the government, I dissent from the portion of the majority opinion which affirms that conviction.

---

* I note that we are now issuing a second opinion in this case, as a result of the challenge the government filed to our first—and, I believe, correct—decision. Not only did the government not rely on the majority's argument on its behalf the first time it presented its case to us, but it didn't rely on it the second time, either.