UNITED STATES of America, Plaintiff–Appellee,

v.

Billy Louis COLLINS, Defendant– Appellant.

No. 94–5016.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 2, 1995.

Decided March 11, 1996.

---

Jane E. Graham, Asst. U.S. Attorney (argued and briefed), Lexington, KY, for Plaintiff-Appellee.

Peter L. Ostermiller, Stallings & Stallings, Louisville, KY, Frank E. Haddad, Jr. (argued and briefed), Louisville, KY, Nathan Z. Dershowitz, Dershowitz & Eiger, New York City, for Defendant-Appellant.

Before: KEITH, and NELSON, Circuit Judges; BELL, District Judge.*

---

\* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

1. Following her election, and at Defendant's urging, each of these individuals was rewarded with a position either in the Collins Administration or with the University of Kentucky Board of Trustees. Thompson became the Secretary of Finance; Poore became Secretary of Transportation; Wilson became Secretary of Public Protection; Wright became an Administrative Assistant in the Governor's office; and Wilcoxson was appointed to the University of Kentucky Board of Trustees.

ROBERT HOLMES BELL, District Judge.

Defendant-Appellant Billy Louis Collins was convicted of conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, and conspiracy to defraud the United States by impeding the IRS function, in violation of 18 U.S.C. § 371. He was sentenced to concurrent terms of imprisonment of 63 months on Count 1 and 60 months on Count II. Collins appeals his conviction and sentence. For the following reasons we affirm the conviction and sentence.

### I.

Billy Louis Collins is the husband of Martha Layne Collins, Governor of the Commonwealth of Kentucky from 1983 to 1987. The indictment charges Collins with conspiring to extort money from those who sought to do business with the Commonwealth of Kentucky from October 1983 through September 1989. The Court views the evidence presented during the seven week trial in the light most favorable to the government.

Defendant Collins was a dentist who also served as a fundraiser for his wife's political pursuits. After his wife won the democratic primary for governor in May 1983, Collins recruited Melvin Wilson, Floyd Poore, A.D. Wright, Lester M. "Mac" Thompson and Billy Wilcoxson as his five major fund-raising strategists for his wife's gubernatorial campaign.[1] Together with these individuals Collins solicited contributions for the fall Democratic campaign and the Democratic Party in exchange for the right to contend for state contracts, particularly in the area of engineering and bond underwriting contracts.

Lester M. Thompson, who testified under a grant of immunity, was the government's primary witness. Thompson served as Secretary of Finance for the first year of the Collins Administration, from December 1983 to December 1984, when he was replaced as

Secretary of Finance by Gordon Duke. The Secretary of Finance had ultimate responsibility for the award of contracts for engineers and architects which came through the Office of Facilities and Management. The Secretary of Finance also had responsibility for overseeing the issuance of bonds to finance large projects, such as turnpike issues and bond projects for the Kentucky Housing Corporation.

J.M. Crawford was a civil engineer who specialized in highway and bridge construction. Prior to the Collins administration he had received few engineering contracts from the Commonwealth. In August 1983 Crawford and another civil engineer approached Billy Wilcoxson about obtaining engineering contracts during the Collins administration. Wilcoxson told them to contribute $25,000 to receive "consideration for work to come."

The engineers made the payment directly to Wilcoxson. Subsequently, when Crawford submitted bids on state contracts he would bring copies of his bids to Wilcoxson. He began to obtain state engineering contracts.

In the spring of 1984, Wilcoxson summoned Crawford to his home and told him he had a horse lease proposition which would be an excellent tax write-off. Wilcoxson simultaneously advised Crawford that he, along with Collins and Thompson, were on the board that reviewed and selected the consultant engineers' contracts. Although Crawford did not need a tax shelter, he felt that if he did not invest, he would have no hope of getting state jobs in the future.

Over a two year period Crawford invested $160,000 in a lease with Equine Kentucky Thoroughbred Leasing.[2] During this time Crawford experienced considerable success in obtaining work with the state. Furthermore, once Eddie Coleman, the Democratic Party Chairman, learned Crawford was contributing to the horse leasing program, he stopped pressuring Crawford for contributions to the party.[3] However, when Craw-

ford allowed the lease to lapse after two years, Coleman again began expecting Crawford to contribute 3% of what he received by way of state contracts.

Lynn Luallen had been the Executive Director of the Kentucky Housing Corporation ("KHC"), a state agency which financed housing with proceeds of bonds guaranteed by the Commonwealth of Kentucky, during a previous administration. In the fall of 1983 Collins and Thompson asked Luallen to contact people he knew in the investment banking business on Wall Street to see if they would make contributions of $25,000 to the Kentucky Democratic Party in exchange for the opportunity to do business with the Commonwealth.

Luallen spoke with Bill Johnston at the Wall Street investment banking firm of Donaldson, Lufkin and Jenrette ("DLJ"). When he requested a $25,000 contribution, Johnston asked what he would get for it. Luallen told him that DLJ would get a "level playing field" and that if they wanted more information, they needed to talk to Collins.

Shortly thereafter, Joseph Harcum and Johnston of DLJ travelled to Kentucky with the initial installment on the $25,000 payment. Harcum and Johnston were introduced to Collins and met privately with him to discuss the Kentucky Housing Corporation.

In December 1983, after the election, and after DLJ had made payment in full of the $25,000 to the Kentucky Democratic Party and the Martha Layne Collins Inaugural Committee '83 fund, Harcum and Johnston returned to Kentucky for another meeting with Collins and Thompson to discuss the award of a $300–million Turnpike Bond issue.

Defendant held a breakfast meeting at the Governor's Mansion for investment bankers. Following the meeting Defendant gave Thompson a list of those investment bankers who were to participate in the $300–million

---

2. Equine Kentucky Thoroughbred Leasing was formed by Richard Broadbent, a friend of Collins and an expert in the horse business, and Wilcoxson. Collins, Thompson and Wilson were shareholders.

3. Typically, Eddie Coleman would collect a fee of 3–5% of the architectural and engineering contracts from each of the recipients in cash. Collins would periodically stop by Democratic headquarters to pick up envelopes of cash from Coleman.

bond issue. Consistent with Collins' instructions, DLJ was named as the lead manager on the $300–million Turnpike Bond issue.

In the spring of 1984 Collins, Wilcoxson, Thompson, and Broadbent met to discuss ways of providing for the Collins' retirement. They decided to use horse partnerships as a vehicle for funneling kickbacks from those doing business with the state. During 1984 and thereafter, Defendant Collins led the formation of limited horse investment partnerships known as Collins Partners No. 2 and Collins Partners No. 3.

Based upon DLJ's award of the $300–million bond issue, Collins calculated that DLJ owed a commission of $500,000 to $600,-000 which would be invested in Collins Partners No. 2. DLJ agreed to purchase six partnership units in Collins Partners No. 2 at $100,000 per unit. Subsequently, DLJ agreed to purchase six additional units in exchange for the lead manager position on the $100–million Kentucky Housing bond issue to be let in the fall of 1984.

In August 1984 DLJ was named lead manager of the $100–million KHC bond issue. Shortly thereafter, $1,150,000 worth of partnership units in Collins Partners No. 2 were purchased by individuals in the Public Finance Section of DLJ with loans from DLJ.[4]

Directly after the purchase of the partnership units, Luallen solicited $35,000 from DLJ for a custom-built piano to be presented by Collins as a gift to his wife. DLJ's Johnston commented that "those guys are tough." Nevertheless, DLJ sent the check directly to Defendant Collins.

In December 1985 DLJ was awarded another $100–million KHC bond issue, in exchange for DLJ's commitment to purchase five units at $50,000 per unit in Collins Partners No. 3. Shortly after the award of the bond issue, 4 individuals at DLJ purchased $250,000 worth of partnership units.

In December 1985 DLJ received only a co-manager position on a $40–million KHC issue. Johnston reacted angrily to being de-nied the lead position on the $40–million issue since he felt DLJ had done everything that had been asked of them, and they were to be the people who did housing bonds.

Prior to the time frame of the alleged conspiracy, DLJ had never done business as a bond managing underwriter with the Commonwealth of Kentucky. During the period of the conspiracy DLJ was awarded the lead manager position on the Turnpike Authority Economic Development $300–million bond issue in May 1984, the $100–million KHC bond issue in November 1984, the KHC Single–Family $100–million bond issue in December 1985; and a co-manager position on the KHC Multi–Family $40–million bond issue in December 1985. During the same time period DLJ personnel invested $1,336,500.00 in Collins Partners No. 2 and No. 3.

Cranston Securities was another investment banking firm that had never done business as a bond managing underwriter with the Commonwealth of Kentucky prior to 1984. In July 1984 Robert Cranston Kanuth, Jr., CEO of Cranston, met with Collins for the purpose of securing a KHC bond underwriting contract. After that meeting Collins told Thompson that Cranston was a player and instructed him to award Cranston a 15% junior management position in the 1984 $100–million KHC issue to show that he could get the job done. At the same time Kanuth bought a $100,000 unit in Collins Partners No. 2.

Thereafter, Kanuth agreed to make additional investments for additional business with the Commonwealth. Cranston was awarded the lead manager position on the Turnpike Authority Resource Recovery $309–million bond refunder in June 1985, the Turnpike Authority Toll Road $226–million bond issue in July 1986, the Turnpike Authority Economic Development $367–million bond issue in August 1986, the Turnpike Authority Resource Recovery $257–million bond issue in May 1987, and the Turnpike Authority Economic Development $36,600,-000.00 bond issue in November 1987. Cran-

---

4. Some of the investment was originally made in the name of DLJ. Defendant, on the advice of Thompson, turned back the investment, and those partnership units were parcelled out among individuals at DLJ. The individual investors were held harmless by DLJ from any loss, and the loans were ultimately forgiven.

ston was also awarded lesser management positions of 15% on the KHC bond issue in November 1984, 25% on the KHC Single–Family Bond issue in December 1985, and 40% on the Student Loan Corporation bond issue in November 1986. During the same period, individuals associated with Cranston invested $412,400 in Collins Partners No. 2 and No. 3.

The evidence of awards of government contracts to contributors was balanced by evidence of the denial of contracts to those who refused to contribute.

John Rasnick and C.D. Roberts, engineers from Eastern Kentucky, contacted Melvin Wilson, Secretary of Public Protection, to seek his assistance in procuring a meeting with the Secretary of Transportation. When they met with Wilson they were taken first to talk to Collins, who tried to sell them horse partnerships. They perceived that if they purchased units in the horse partnership they would receive favorable action on their proposal. They did not purchase any units, and they never received their meeting with the Secretary of Transportation.

Dr. Ronald Chism contacted A.D. Wright, Administrative Assistant to the governor, to inquire about the installation of a traffic light. Wright attempted to sell Chism shares in Collins' horse partnership. Although Chism told him he had no interest, Wright continued to press him about investing in Collins' business. Chism never invested, and he never received the assistance he requested.

Defendant's own financial statements demonstrated that he realized a dramatic increase in his net worth during the period of the conspiracy. A substantial portion of the increase in net worth was directly related to assets from the partnerships.

Collins was charged in a 17 page indictment with one count of extortion in violation of the Hobbs Act and one count of conspiracy to defraud the Internal Revenue Service. After an eight-week trial in the Eastern District of Kentucky, a jury found Collins guilty of both counts. Collins appeals his convictions and sentence, raising thirteen issues on appeal.

## II.

### A. Sufficiency of the Evidence

Count I of the indictment charged that the Defendant engaged in a conspiracy with public officials and others to extort money in the form of political contributions, investments in thoroughbred horse limited partnerships and other payments in exchange for business and the opportunity to do business with the Commonwealth of Kentucky, in violation of the Hobbs Act, 18 U.S.C. § 1951, under color of official right.[5]

Collins challenges his conviction under the Hobbs Act. He contends the evidence was insufficient to sustain a conviction on the fear of economic harm theory. He also contends that because he was not a public official, he could not be convicted of extortion under the color of official right theory.

### 1. Fear of Economic Harm

Collins contends there is no evidence that the companies and individuals who made payments did so out of fear. He contends that at most the government has made out a case of bribery, and that accordingly the Hobbs Act is not applicable as a matter of law.

Although Collins characterizes this as an issue involving the misapplication of the law subject to *de novo* review, the issue is more correctly construed as one involving the sufficiency of the evidence. *See, e.g., United*

**5.** The Hobbs Act provides in pertinent part:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—
. . . .
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

*States v. Capo*, 817 F.2d 947, 952 (2nd Cir. 1987). The standard of review for determining the sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Spears*, 49 F.3d 1136, 1140 (6th Cir.1995). In making this determination the reviewing court does not reweigh the evidence or determine the credibility of the witnesses. *Id.*

■■■ For purposes of the Hobbs Act, extortion by wrongful use of fear encompasses threats of economic loss. *United States v. Dischner*, 974 F.2d 1502, 1517 (9th Cir.1992), *cert. denied*, 507 U.S. 923, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993); *United States v. Stodola*, 953 F.2d 266, 271 (7th Cir.), *cert. denied*, 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). The fear need not be the product of the defendant's actions. "It is enough if the fear exists and the defendant intentionally exploits it." *United States v. Williams*, 952 F.2d 1504, 1513–14 (6th Cir.1991).

■■■ Bribery, on the other hand, is not within the reach of the Hobbs Act. *United States v. Capo*, 817 F.2d 947, 954 (2nd Cir. 1987). A classic example of bribery is made out where the "'victims' faced no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants...." *Capo*, 817 F.2d at 954.

■■■ Collins contends the case against him is a classic case of bribery because the evidence demonstrates that the so-called victims were in fact motivated to make payments by their "desire for economic gain" rather than by a fear of economic loss. Collins contends that DLJ and Cranston invested voluntarily in the hopes of receiving favorable treatment in obtaining bond contracts. Because neither DLJ nor Cranston had done business with the state prior to the time frame of the alleged conspiracy, they had nothing to lose and much to gain. According to Collins, this evidence demonstrates at best bribery by willing participants.

Collins contends his extortion conviction fails for the same reason as the extortion conviction in *United States v. Garcia*, 907 F.2d 380 (2d Cir.1990). In *Garcia* a company made payments to a congressman to induce him to use his influence to help it obtain a government contract. On appeal Garcia's conviction for extortion was reversed. The Second Circuit reasoned that Garcia could not be convicted based upon the fear of economic harm theory since there was no evidence that the company "acted out of fear that without these payments it would lose existing contracts or even opportunities to which it was legally entitled." *Id.* at 385.

In contrast to *Garcia*, the evidence in this case was sufficient to establish that DLJ and Cranston acted out of fear that without the payments they could lose the opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled. They were not merely hoping to receive government contracts. They paid out of a fear that unless they paid money to Defendant or at his direction, they would forfeit any potential business opportunity with the Commonwealth of Kentucky.

This case bears more resemblance to *Stodola, supra*. In *Stodola* there was evidence that the County Commissioners did not award contracts through the bidding process required by law, but rather awarded contracts to the companies that paid them the most kickback money. 953 F.2d at 271. The Seventh Circuit concluded that the evidence was sufficient to enable a rational trier of fact to conclude that the payments made to the commissioners were induced by fear of economic loss. *Id.*

DLJ, Cranston and Crawford all faced the threat that if they did not contribute to the party or invest in Collins' horse partnerships, they would not be considered for state contracts. They would not be able to get in the door. They received the clear message that in order to compete for bond business in Kentucky, they would have to pay the gate keeper, Bill Collins.

Viewing the evidence in the light most favorable to the government, we are satisfied that the evidence was sufficient to support

the conviction of extortion by fear of economic loss.

## 2. Color of Official Right

Collins also contests his extortion conviction on the basis that he cannot be convicted under the color of official right theory because he was not a public official and Gordon Duke, the Secretary of Finance who awarded the vast majority of bond issues, was not a co-conspirator.[6]

Defendant relies on *United States v. Tomblin*, 46 F.3d 1369 (5th Cir.1995), for the proposition that a private citizen cannot be charged with extortion under color of official right. In *Tomblin* the Fifth Circuit reversed Tomblin's conviction for extortion because he was not a public official and was not in the process of becoming one. *Id.* at 1382–83. Although he was convicted of threatening to use his political influence, his power was not official power. *Id.* at 1383.

*Tomblin* is clearly distinguishable from the case before us. Unlike Collins, Tomblin was convicted of the substantive crime of extortion, not conspiracy to extort. Tomblin only had unofficial power over an official. *Id.* He was not accused of conspiring with an official.

■ Moreover, even in *Tomblin* the court observed that although public officials are usually the only ones charged with extorting property under color of official right, private persons have been convicted of extortion under color of official right in limited circumstances. *Id.* at 1382. One such circumstance noted by the court is where the individual aided and abetted a public official's receipt of money to which he was not entitled. *See, e.g., United States v. Margiotta,* 688 F.2d 108, 131 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

More recently the Fourth Circuit held in *United States v. Hairston,* 46 F.3d 361, 366 (4th Cir.1995), that a private person can be convicted of aiding and abetting a public official who extorts under color of official

right. The court reasoned that "[o]ne who collects the extorted payments is no less guilty than the official he serves." *Id.* Similarly, in *United States v. Box,* 50 F.3d 345, 351 (5th Cir.1995), the Fifth Circuit rejected a bail bondsman's argument that he could not be guilty of extortion "under color of official right" because he was not a public official. The court reaffirmed the principle that a private person may be convicted of aiding and abetting a public official's extortion under the Hobbs Act. *Id.*

Assuming Collins' relationship to Thompson as Secretary of Finance was sufficient to support a conviction for conspiracy to extort under color of official right, Collins contends that the conspiracy only lasted as long as Thompson held office. He contends that the Hobbs Act "color of official right" theory of prosecution is not applicable as a matter of law in the absence of a participating, co-conspirator official.

■ The indictment charged a conspiracy lasting from October 16, 1983 to September 15, 1989. Thompson only served as Secretary of Finance from December 1983 to December 1984. During Thompson's tenure as Secretary of Finance, DLJ received lead manager positions on only two bond issues and Cranston received only a 15% managerial position on one of those. The vast majority of the bond issues at issue in this case were awarded by Gordon Duke, who was Secretary of Finance from December 1984 to December 1987. Duke was not a named co-conspirator. Under Defendant's theory, the conspiracy ended at the close of 1985 when Thompson no longer held authority to perform the official act of awarding contracts on behalf of the Commonwealth.

We reject Defendant's theory for two reasons. First, the indictment does not limit itself to the actions of the Secretary of Finance. The indictment charges that during the period 1983 through 1987 Collins and Thompson held themselves out as capable of

---

6. Where, as here, the government proceeds on alternative theories, and the jury returns a general verdict, there must be sufficient evidence and proper instructions to support both theories. *See United States v. Martinez,* 14 F.3d 543, 553 (11th Cir.1994); *Garcia,* 992 F.2d at 416; *United*

States v. Taylor, 993 F.2d 382, 384 (4th Cir. 1993). Therefore, this Court's conclusion that the evidence was sufficient to support a conviction on a theory of fear of economic loss does not end the analysis.

controlling the award of certain business with the Commonwealth of Kentucky through Lester M. Thompson as Secretary of Finance "and other Kentucky state government officials." There was ample evidence of extortionate demands being made by Luallen and Wilcoxson, both public officials, at the direction of Collins and Thompson. There is also evidence that Collins conspired with A.D. Wright, Senior Administrative Assistant to the Governor from December 1983 through August 1985, Edward Coleman, Chairman of the Kentucky Democratic Party, and Melvin Wilson, Secretary of Public Protection, to extort payments from those seeking to do business with the Commonwealth.

██ Second, contrary to Defendant's position, it is not necessary that the public official have final authority or control. In *United States v. Freeman,* 6 F.3d 586 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1661, 128 L.Ed.2d 378 (U.S.1994), the court held that a legislative aide could be found guilty of extortion under color of official right. The Hobbs Act reaches "anyone who actually exercises official powers." *Id.* at 593. In *Freeman* the court found sufficient evidence that the defendant legislative aide created the impression that he could affect legislation, and that he did, in fact, use his official position to shepherd bills through the legislative process to induce payments from the undercover FBI agents. *Id.*

Like the Ninth Circuit we conclude that the Hobbs Act reaches those public employees who may lack the actual power to bring about official action, but create the reasonable impression that they do possess such power and seek to exploit that impression to induce payments. *Id.* Although Collins held no state office, he held himself out to officers of various engineering firms and investment banking firms as being capable of controlling the award of certain contracts and other state business. Moreover, even though Duke, a non-conspirator, had final say as Secretary of Finance on the letting of contracts, there is ample evidence that he relied on the recommendations of others over whom Collins had control.

██ The evidence, viewed in the light most favorable to the government, is suffi-

cient to show that even after Thompson was no longer Secretary of Finance, Collins and Thompson conspired with other public officials to extort money in exchange for the right to do business with the Commonwealth of Kentucky. A rational trier of fact could have found the essential elements of the crime of conspiracy to commit extortion under color of official right beyond a reasonable doubt.

### B. Variance

Collins argues that his conviction suffers from a fatal variance between the indictment and the proofs at trial. He contends that the trial court erred in allowing the government to submit evidence that Defendant "controlled" Duke, a non-conspirator, where there was no allegation to this effect in the Indictment.

██ "A variance occurs when 'the charging terms [of the indictment]' are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Hathaway,* 798 F.2d 902, 910 (6th Cir.1986). To obtain a reversal due to a variance between the indictment and the evidence, a two-prong test must be satisfied: (1) the variance itself must be demonstrated; and (2) the variance must affect some substantial right of the defendant. *United States v. Kelley,* 849 F.2d 999, 1002 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988).

██ Upon review we find no fatal variance between the indictment and the proofs. The indictment alleges a conspiracy between Collins and others to extort money under color of official right. The indictment also alleges that from 1983 through 1987 Collins and Thompson held themselves out as capable of controlling the award of certain business with the Commonwealth of Kentucky through Thompson as Secretary of Finance "and other Kentucky state government officials." The reference to control over "other Kentucky state government officials" is broad enough to include control over Duke, who is specifically identified in the indictment as the Secretary of Finance from December 1984 to December 1987.

Because we conclude that a variance has not occurred in the instant case, we need not consider whether and to what extent Collins' substantial rights have been impaired.

### C. Jury Instructions

Defendant has raised two challenges to the jury instructions for Count I.

### 1. Instruction on Wrongful

Defendant contends the court improperly instructed the jury on the definition of the term "wrongful" in the context of the "fear of economic loss" branch of extortion because it failed to include an instruction on mens rea. Defendant contends that the court should have instructed that the term "wrongful" means that the defendant "believed" he had no lawful right to the property obtained.[7]

 Because Collins made no objection to this instruction at trial, the instruction is reviewed for plain error.[8] "Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice." *United States v. Frazier*, 936 F.2d 262, 266 (6th Cir.1991)(quoting *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir.1988)). The instruction is reviewed in the context of the jury instructions "as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir.1991).

 In addition to the instruction on "wrongful," the jury received the standard instruction on proof of a defendant's state of mind and specific intent.[9] The jury was also instructed that because the partnerships were "legitimate, viable and operating horse businesses," and because the solicitation and making of political contributions in and of itself is not a crime, the government must prove beyond a reasonable doubt that the defendant "conspired to accept the payments in a manner which would violate the law."

Upon review we are satisfied that the jury was adequately instructed on the required mens rea.

### 2. Instruction on Quid Pro Quo

Defendant asserts that the instruction on extortion under color of official right was inadequate because it permitted conviction based on mere "influence" rather than on an "explicit promise" and "official acts," the *quid pro quo* requirements identified in *McCormick v. United States*, 500 U.S. 257, 271–73, 111 S.Ct. 1807, 1816, 114 L.Ed.2d 307 (1991), and *Evans v. United States*, 504 U.S. 255, 267–69, 112 S.Ct. 1881, 1889, 119 L.Ed.2d 57, 72 (1992).

In *McCormick* the Supreme Court held that in a prosecution for extortion under color of official right, the receipt of political contributions violates the Hobbs Act "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, 500 U.S. at 273, 111 S.Ct. at 1816. In *Evans* the Supreme Court clarified that fulfillment of the *quid pro quo* is not an element of the offense. *Evans*, 504 U.S. at 268, 112 S.Ct. at 1889. "[T]he offense is

---

7. The court instructed on "wrongful" as follows: The term wrongful means that the defendant had no lawful right to the property obtained and that the property was obtained because of the victim's fear of economic loss. If the object or purpose of the defendant was to obtain money to which the defendant was lawfully entitled, then the defendant did not act in a wrongful manner. Thus if you find that the defendant accepted or received money or fees in exchange for legitimate services that he performed, you must find that the defendant did not obtain these monies wrongfully. Furthermore, if you find that the individual investors made voluntary investments in the horse partnerships without fear of economic loss, you must find that the defendant did not obtain these investments wrongfully.

8. In fact, the government contends that because Defendant submitted this instruction he should not be heard to complain about it. *See United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993). The government, however, has failed to support this contention with the relevant portion of the record. We are accordingly unable to assess the merits of this argument.

9. "To establish specific intent, the government must prove beyond a reasonable doubt that the defendant knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law."

completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense." *Id.* "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.*

"What the Hobbs Act proscribes is the taking of money by a public official in exchange for *specific* promises to do or refrain from doing *specific* things.... In other words, there must be a quid pro quo." *United States v. Farley,* 2 F.3d 645, 651 (6th Cir.1993)(quoting *United States v. Bibby,* 752 F.2d 1116, 1127 n. 1 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986)) (emphasis in original), *cert. denied,* —— U.S. ——, 114 S.Ct. 649, 126 L.Ed.2d 607 (1993).[10]

The trial court gave the following jury instruction on extortion under color of official right:

> If you find than [sic] there were such payments in the form of political contributions to Democrats Together and Kentucky Democratic party, you must find that the conspiratorial agreement contemplated that a public official would perform or agree to perform the requested act or exercise of official authority or would be influenced in the performance of his duties, or that the subsequent operation of the conspiracy in fact caused the exercise or influence of official authority or duties. However, with respect to all other payments, for example, horse lease payments, limited partnership payments and payments for a piano, it is enough if the defendant conspired to acquire or cause the acquisition of that property or payment, knowing it was being given for such

exercise or influence, and that the government need not prove that the conspiratorial agreement actually contemplated the performance of the requested act, exercise or influence of official authority or duty.

Collins contends that the district court's *quid pro quo* instruction was inadequate because it did not include a *quid pro quo* requirement in the non-campaign context, and because its use of the term "influence" in both the campaign contribution and non-campaign contribution contexts failed to adequately state the *quid pro quo* requirement.

Although Defendant objected to the instruction at trial, his objections were based upon different grounds than he raises here. Because he did not raise the current objections at trial, the instructions are reviewable only for plain error. *United States v. Pearce,* 912 F.2d 159, 163 (6th Cir.1990), *cert. denied,* 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991).

Whether or not there is a *quid pro quo* requirement in the non-campaign context is an issue that has not been directly addressed by the Supreme Court.

In *United States v. Blandford,* 33 F.3d 685 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1821, 131 L.Ed.2d 743 (U.S.1995), we questioned whether the *quid pro quo* requirements of *McCormick* and *Evans* apply when a public official's acceptance of non-campaign payments forms the basis for that official's extortion charge. *Id.* at 697. Although this Court expressed the view that *Evans* was limited to the campaign contribution context, *Blandford* did not require resolution of the issue because the instruction at issue tracked the relevant language of *Evans* and inured to the defendant's benefit. *Id.* at 698.[11]

---

**10.** "The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Evans,* 504 U.S. at 274, 112 S.Ct. at 1892 (Kennedy, J., concurring)(cited with approval in *United States v. Blandford,* 33 F.3d 685, 696 (6th Cir.1994)).

**11.** Because *quid pro quo* is required for a campaign contribution case, "it follows *a fortiori* that in non-campaign contribution cases, which are perhaps less, but clearly not more, difficult to prove from the government's standpoint, the same showing of a *quid pro quo* also would suffice." *Blandford,* 33 F.3d at 697. In effect, the instruction at issue in *Blandford* required the government prove a campaign contribution case even though no campaign contributions had in fact been made. *Id.*

Judge Nelson filed a concurring opinion in *Blandford* in which he expressed his understanding that the *quid pro quo* requirement of *McCormick* is not limited to campaign fund cases. *Evans* involved a hybrid campaign contribution and non-campaign contribution. As Justice Kennedy stated in his concurring opinion in *Evans*: "Readers of today's opinion should have little difficulty in understanding that the rationale underlying the Court's holding applies not only in campaign contribution cases, but all § 1951 prosecutions." 504 U.S. at 278, 112 S.Ct. at 1894 (Kennedy, J., concurring).

■ Although the Supreme Court has not directly ruled on the *quid pro quo* requirement outside the context of campaign contributions, most circuits that have addressed the issue have determined that the *quid pro quo* requirement applies in non-campaign contribution cases as well as campaign contribution cases. *See, e.g., United States v. Hairston*, 46 F.3d 361, 365 (4th Cir.1995); *United States v. Martinez*, 14 F.3d 543, 553 (11th Cir.1994); *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir.1993). We now join these circuits in holding that the *quid pro quo* requirement applies to all § 1951 extortion prosecutions, not just to those involving campaign contributions.

Hobbs Act convictions have been reversed where the jury was improperly instructed on the *quid pro quo* requirement. *See, e.g., Taylor*, 993 F.2d at 384–85 (jury instructed that there need be no promise with respect to official action in return for the payment); *United States v. Martinez*, 14 F.3d 543, 552 (11th Cir.1994)(jury instructed that they could find extortion under color of official right where the official accepted a benefit knowing such payment was "motivated by hope of influence"); *Garcia*, 992 F.2d at 415 (jury instructed that they could convict on the basis that the defendant solicited the payment of money "in connection with" his official duties, or if the acceptance of benefits "could reasonably have affected the defendant's exercise of his duties").

■ An instruction, however, should not be judged in artificial isolation. It must be considered "in the context of the instructions as a whole and the trial record." *Estelle v.*

*McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, 399 (1991).

In *United States v. Hairston*, 46 F.3d 361 (4th Cir.1995), the jury was instructed in part, that "if a public official accepts things of significant value to which he was not entitled, and which he knows were given to him with the expectation of influencing his conduct of his public office, such action would constitute extortion." The court read the instruction in the context of the instructions as a whole and the trial record, and determined that although the district court's instruction was not a model for future cases, it adequately conveyed the necessity of proof of a *quid pro quo*. *Id.* at 372–73.

■ Immediately prior to the paragraph Defendant contends is objectionable, the jury was instructed that as an element of the offense of conspiracy to commit extortion by obtaining money under color of official right, they would have to unanimously find that the government proved beyond a reasonable doubt that the conspirators "agreed to acquire or attempt to acquire money or property in return for an official act or exercise of official authority by public officials." Later in the instructions they were instructed as follows:

> The solicitation and making of political contributions in and of itself is not a crime. As you are all aware, most political activity is financed through voluntary contributions and such contributions are commonly made by those who have the greatest interest in the outcome of the process. Accordingly you must bear in mind that contributions by interested parties are not, standing alone, in any way illegal. Rather, the government must prove more than just the mere solicitation and making of political contributions for you to find the defendant guilty of conspiracy to commit extortion under color of official right. The government must prove beyond a reasonable doubt that the defendant conspired to extort political contributions in exchange for influence in the award of state bond underwriting and engineering contracts.

The government's evidence and argument in this case were directed at Defendant's

promises to insure that donors were put on a level playing field regarding specific governmental projects such as road contracts, bridge contracts, housing issues, and bond issues in exchange for their contributions and investments.

The instruction in this case, like the instruction in *Hairston,* is not a model for future cases. Nevertheless, when the instructions are viewed as a whole, and in the context of the entire trial, it appears that the instruction satisfies the requirement of *quid pro quo* set forth in *Evans.*

## D. Evidentiary Issues

■■■ Collins' challenges to the trial court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Taplin,* 954 F.2d 1256, 1258 (6th Cir.1992).

### 1. Bill Johnston's Statements

Collins contends the court abused its discretion by admitting certain prejudicial hearsay evidence under the state-of-mind exception to the hearsay rule and by failing to admonish the jury when the government used the statement to show more than state of mind in its arguments to the jury.

■■■ The statements at issue are attributed to Bill Johnston of DLJ and came into evidence through the testimony of Lynn Luallen. The statements involved Johnston's reactions when DLJ was asked to make a donation for the piano and when he was informed that DLJ was awarded a second position rather than first position on a Kentucky Housing Corporation bond issue.

The district court did not abuse its discretion in admitting these statements. The statements were admissible under the state-of-mind exception to the hearsay rule.[12] Fed.R.Evid. 803(3). In a prosecution based upon extortion through fear of economic loss, the state of mind of the victim of extortion is highly relevant. *United States v. Kelly,* 722 F.2d 873, 878 (1st Cir.1983), *cert. denied,* 465

U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984).

Neither did the district court abuse its discretion in failing to instruct the jury on the limited purpose of the testimony. The court offered to give an admonition or limiting instruction any time Defendant requested. The record reflects that the court in fact gave a limiting instruction each time it was requested to do so. In each instance where Defendant complains the court failed to give an admonition where one should have been given, he waived his right to complain by failing to ask that an admonition be given.

### 2. Financial Evidence

■■■ Collins contends the court abused its discretion by refusing to allow him to present his own evidence as to his financial situation. Because the government was allowed to introduce substantial evidence on the increase in Defendant's net worth during the period covered by the conspiracy, Defendant contends he was denied his right to present a defense when his evidence was excluded.

The district court excluded Defendant's financial evidence as confusing and irrelevant. We find no abuse of discretion in this ruling. Defendant's accountant, Mark Raye, acknowledged that the evidence did not use generally accepted accounting methods and did not reflect Defendant's actual net worth for any particular year. Instead it reflected the ultimate realized value of the assets based upon later occurring events. Defendant's ultimate financial success from the venture, however, is irrelevant to his conviction. *See United States v. Hamilton,* 689 F.2d 1262, 1269 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). Because the evidence relied upon hindsight valuations it had little probative value on the issue of what Defendant believed at the time regarding the potential success of the conspiracy.

12. The district court also determined that the statements were admissible under the co-conspirator exception to the hearsay rule as to Count II. Although Johnston had not been listed as a co-conspirator, the district court could properly find on the record that Collins was aware that Johnston was an alleged unindicted co-conspirator and that Collins was not prejudiced by the government's oversight in failing to list Johnston together with the other individuals from DLJ.

### 3. Expert's Conclusions

 Defendant contends the district court abused its discretion in allowing the government to use lengthy recapitulations of the evidence in its questions to its expert witness, Tere Mynatt. Defendant characterizes the government's questioning of Mynatt as an improper use of an expert to make credibility determinations and to withdraw from the jury the simple issue of whether defendant and others conspired to defraud the United States.

Defendant misstates the import of Mynatt's testimony. Mynatt did not comment on the truthfulness of any of the witnesses. Neither did he testify to the existence of an agreement. The government merely asked Mynatt to assume "hypothetical" facts consistent with the proofs the government had presented and to explain the tax implications of the transactions involved in the alleged conspiracy.

Expert testimony on the income tax implications of certain actions are clearly permissible. *United States v. Barnette*, 800 F.2d 1558, 1568 (11th Cir.1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987). Here, as in *Barnette*, although the agent was asked to assume the correctness of certain facts in the hypotheticals given to him, the credibility of the testimony underlying those hypotheticals was not withdrawn from proper independent determination by the jury. *Id.* at 1569. We find that the district judge did not abuse his discretion in permitting Mynatt to testify in this manner.

### III.

Count II of the indictment charges Defendant with conspiracy to defraud the United States by obstructing and impeding the ability of the IRS to ascertain and collect taxes in violation of the general conspiracy statute, 18 U.S.C. § 371.[13]

Defendant contends that his conviction on Count II must be set aside because the evidence was not sufficient to support a finding of intent to defraud the IRS.

 Section 371 reaches "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government." *United States v. Jerkins*, 871 F.2d 598, 602 (6th Cir.1989)(quoting *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966)). The statute has been given "a very broad meaning so that 'defraud' extends beyond its common law usage and includes interference or obstruction of a lawful governmental function 'by deceit, craft or treachery or at least by means that are dishonest.'" *United States v. Licciardi*, 30 F.3d 1127, 1131 (9th Cir.1994)(quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). Although the statute is broadly construed, "[i]t is fundamental that a conviction for conspiracy under 18 U.S.C. § 371 cannot be sustained unless there is 'proof of an agreement to commit an offense against the United States.'" *Ingram v. United States*, 360 U.S. 672, 677–78, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959).

 Participation in a conspiracy need not be proved by direct evidence. *United States v. Shermetaro*, 625 F.2d 104, 108 (6th Cir.1980). "The nature of the agreement comprising a conspiracy may be inferred from circumstantial evidence." *United States v. Spears*, 49 F.3d 1136, 1142 (6th Cir.1995). Thus, the government need not prove a formal agreement—a tacit or mutual understanding to engage in a common plan is sufficient. *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir.1989).

 Moreover, the conspiracy to defraud the United States need not be the main objective of the conspirators. A conspiracy may have multiple objectives, but if one of the objectives, even a minor one, is the evasion of federal taxes, the offense is made out, even though the primary objective may be

---

**13.** Title 18 U.S.C. § 371 provides, in relevant part:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under the title or imprisoned not more than five years, or both.

concealment of another crime. *Ingram*, 360 U.S. at 679–80, 79 S.Ct. at 1320. "If a tax evasion motive plays any part in a scheme, the offense can be made out even though the scheme may have other purposes such as the concealment of other crimes." *Shermetaro*, 625 F.2d at 109.

■ Nevertheless, it is not sufficient for the government to merely show that Defendant's actions had an incidental effect on the IRS. As the Ninth Circuit stated in *United States v. Licciardi*, 30 F.3d 1127 (9th Cir. 1994), "[t]hat the incidental effects of Licciardi's actions would have been to impair the functions of the BATF does not confer upon him the *mens rea* of accomplishing that object." *Id.* at 1132.

■ In this case, the government was required to show that Defendant and his co-conspirators intended, as at least one of their objectives, to impair the functions of the IRS. The intent element of § 371 does not require the government to prove that the conspirators were aware of the criminality of their objective, but it does require the government to show that they knew of the liability for federal taxes. *Ingram*, 360 U.S. at 678, 79 S.Ct. at 1319.

■ According to the government, the object of the conspiracy charged in Count II was to obtain the extortion money under the guise of legal payments as political contributions, gifts and business investments, and that disguise effectively foreclosed the ability of the IRS properly to attribute, ascertain, compute and collect taxes.

The government offered no direct evidence of an agreement to impair the IRS function. It did, however, offer ample circumstantial evidence from which a conspiracy to impair the IRS' ability to collect income taxes could be inferred.

As an initial matter, the jury could consider the financial sophistication of those allegedly involved in the tax conspiracy. The jury could easily conclude that Collins was aware of his income tax obligations. As reflected by his involvement in political fundraising and horse partnerships, Collins was fairly conversant in the area of the obligations and tax write-offs. Moreover, he stated himself during a television broadcast that the IRS had to approve of everything he did. There was also ample evidence of the financial sophistication of the partners at DLJ and Cranston who did business with Collins. As investment bankers, complex financial transactions and the tax implications of those transactions was at the heart of their professional expertise.

Along with the participants' financial sophistication, the jurors could consider the unconventional manner in which payments were structured. DLJ's initial investment in Collins Partners No. 2 was returned with express instructions that the investment would have to be made in the names of individuals rather than the corporation. DLJ complied with Collins' instructions and the partnership units were parcelled out among members of the firm. The corporate nature of the investment, however, was apparent by the fact that DLJ loaned the purchase money to the investors and held them harmless from any loss associated with the Collins Partners investment.

This evidence supports an inference that DLJ understood Collins' desire to conceal any connection between the source of the investments in his partnerships from the entities who were obtaining business from the Commonwealth and that DLJ tacitly agreed to help this endeavor. Because of the way the transaction was structured, DLJ undoubtedly understood that Collins was not intending to report this investment as personal income, because to do so would be tantamount to informing the government that he was extorting money from those who sought to do business with the Commonwealth.

Collins' request for contributions towards a piano for his wife was also unconventional enough to make it obvious to DLJ that this was yet another Collins scheme for obtaining income that would not be reported to the IRS. Collins had DLJ pay for the piano, then concealed the true donor by presenting the piano "from friends and family."

Additional evidence to support a finding of a conspiracy to defraud the IRS is Collins' periodic receipt of envelopes of cash from the

Democratic Party Chairman. Again, the jury could have inferred that all participants in this arrangement understood that these kickbacks would not be reported to the IRS, because to do so would have been to alert the IRS to the illegal scheme.

While there is no evidence that Defendant ever discussed the effect of the financial transactions on the IRS, based upon the financial sophistication of Collins and those he dealing with and the nature in which the payments were structured, a rational juror could conclude that the participants had at least a tacit or mutual understanding that the IRS would not be informed of the true nature of the transactions and that the IRS' functions would accordingly be impaired.

As previously stated, in evaluating the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution, and consider whether *any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Spears*, 49 F.3d at 1140. Upon review of this record in the light most favorable to the government, we are convinced that the evidence was sufficient to enable a reasonable juror to find the essential elements of a conspiracy to impair the functions of the IRS in violation of 18 U.S.C. § 371, beyond a reasonable doubt.

## IV.

Defendant contends he was denied a fair trial due to the prosecution's injection of personal opinion into the proceedings, through laughter, gestures, expressions, and comments on the credibility of witnesses.

 This Court has adopted a two step approach for determining whether prosecutorial misconduct warrants a mistrial. First we determine whether a prosecutor's conduct and remarks were improper, and then we determine whether the impropriety amounts to reversible error. *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir.1994). As to the second part of the test, we consider whether the conduct and remarks tended to mislead the jury or to prejudice the accused; whether they were isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the evidence against the accused. *Id.* (citing *United States v. Leon*, 534 F.2d 667, 678–83 (6th Cir.1976)).

 The district court judge observed the instances of laughter, gestures and facial expressions cited by Defendant and admonished the prosecution to refrain from such conduct in the future. The conduct may have been improper, but it falls far short of reversible error. The reactions appear to have been isolated and inadvertent, and it is not likely that they misled the jury or prejudiced the accused.

 We turn to Defendant's contention that he was denied a fair trial when counsel for the government injected his personal opinion as to the credibility of witnesses and defense counsel on 6 occasions during his rebuttal argument.[14] All of the remarks except one came in without objection, and no grounds were given for the one objection made. Neither did Defendant seek a curative instruction at the close of the argument. The comments are accordingly reviewed only for plain error. *Carroll*, 26 F.3d at 1383. The plain error doctrine mandates reversal "only in exceptional circumstances" and only where the error is so plain that "the trial judge and prosecutor were derelict in countenancing it." *Id.* (quoting *United States v. Slone*, 833 F.2d 595, 598 (6th Cir.1987)).

 It is well established that the personal opinion of counsel has no place at trial. *Carroll*, 26 F.3d at 1384. It is unpro-

---

14. The prosecutor's statements, paraphrased, are: 1) defense counsel might deserve an Academy Award for keeping a straight face when he made his arguments; 2) I might deserve an Academy Award for not laughing when defense counsel said the payments were motivated by desire; 3) when the DLJ witnesses swore to tell the truth they demonstrated from the tales they told that they have a lot of contempt for the people in Kentucky; 4) the witnesses must think we drive turnip wagons if they expect you to believe this tale; 5) I am not sure every witness fulfilled the oath to tell the truth; and 6) do you have a sense that certain witnesses took their oath seriously to tell the truth?

fessional for counsel to express a personal belief or opinion in the truth or falsity of any testimony. *United States v. Young*, 470 U.S. 1, at 9, n. 7, 105 S.Ct. 1038, at 1043, n. 7, 84 L.Ed.2d 1 (1985). It is also unprofessional for counsel to make personal attacks on opposing counsel. On the other hand, counsel must be given leeway to argue reasonable inferences from the evidence. Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying. *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991).

██ The statements at issue in this case go beyond reasonable inferences from the evidence into the realm of inappropriate expressions of the prosecutor's opinion as to the credibility of witnesses and defense counsel. "Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young*, 470 U.S. at 11, 105 S.Ct. at 1044. "[T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *Id.* at 12, 105 S.Ct. at 1044.

██ In considering the context, it is appropriate to consider whether, and to what extent, a prosecutor's improper argument is invited by defense counsel's argument. *Id.* at 11–12, 105 S.Ct. at 1044–45. In this case defense counsel made at least 6 attacks on the credibility of Thompson, the government's witness, during his closing argument. While these attacks on the credibility of the prosecution's witness do not justify the prosecutor's response, they do tend to minimize the prejudicial effect of the prosecutor's remarks.

██ The prosecutor's remarks must also be viewed in the context of the entire rebuttal argument. During that argument the prosecutor reminded the jurors of their obligation to weigh the credibility of the witnesses. After two of the remarks in issue the prosecutor stated, "But again, that's not for me to decide," and "That's something you'll have to consider in this case." It does not appear that the prosecutor misled the jury or that he removed the issue of credibility of witnesses from the jury.

██ Finally, the remarks are considered against the backdrop of a 7 week trial where there was overwhelming evidence of Defendant's guilt. Upon our review of the record we conclude that the prosecutor's improper statements did not undermine the jury's ability to view the evidence independently and fairly. The error was harmless and does not warrant a new trial.

## V.

In his last argument, Collins contends the trial court erred in including the July 29, 1983, political contribution of $24,500 from J.M. Crawford Associates and Witt & Associates to Bill Wilcoxson in its calculation of Defendant's offense level because the contribution was made almost 3 months prior to the beginning date of conspiracy as alleged in the indictment and because the payment was not made to Defendant.

The district court determined that the contribution was made reasonably near the beginning date of the conspiracy and that in light of subsequent activities it was reasonably foreseeable and properly attributable as relevant conduct to Defendant.

██ A district court's findings with respect to relevant conduct should not be disturbed unless clearly erroneous. *United States v. Moored*, 997 F.2d 139, 143 (6th Cir.1993). Conduct occurring outside the period of the conspiracy may be considered relevant conduct if it was part of the common scheme or plan. *United States v. Miller*, 910 F.2d 1321, 1327 (6th Cir.1990), *cert. denied*, 498 U.S. 1094, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991). We cannot say that the district court's inclusion of the July 1983 payment for sentencing purposes was clearly erroneous.

## VI.

For the forgoing reasons we **AFFIRM** Defendant's conviction and sentence on both counts.